IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## EASTERN DIVISION.

### KNOXVILLE, SEPTEMBER TERM, 1894.

KELLEY BROTHERS *v.* FLETCHER.

(*Knoxville.* October 17, 1894.)

1. SUPREME COURT. *Bill of exceptions essential, when.*

Unless made part of record by bill of exceptions, evidence excluded by the Chancellor on the hearing cannot be looked to by this Court. (*Post, p. 5.*)

Cases cited and approved: Perry *v.* Pearson, 1 Hum., 431; Spurlock *v.* Fulks. 1 Swan, 291; Aymett *v.* Butler, 8 Lea. 453; Steele *v.* Frierson, 85 Tenn., 438; Anderson *v.* Railroad, 91 Tenn., 54.

2. CORPORATIONS. *Stockholders' liability for subscriptions.*

Where a corporation, pursuant to legal authority, issues paid-up non-assessable shares in payment for property or services, it is presumed that the transaction was made in good faith, and the property or services placed at a fair valuation; and creditors

1—10 P

Kelley Brothers *v.* Fletcher.

of the corporation seeking, after its insolvency, to compel the holders of such shares to contribute to payment of debts of the corporation must aver and prove that the transaction was fraudulent, and should not therefore operate as payment in full for such shares. (*Post, pp. 7–16.*)

Cases cited: Merriman *v.* Lacefield, 4 Heis., 217; Austin *v.* Ramsey, 3 Tenn. Ch., 121; 5 Dillon, 50; 119 U. S., 345; 110 Ind., 417; 31 N. E. Rep., 362; 59 Md., 1; 78 Wis., 427 (S. C., 23 Am. St. R., 419, 421); 92 Ala., 407 (S. C., 25 Am. St. R., 82, 83); 146 U. S., 642.

4. SAME. *Payment of stock subscriptions in property.*

Doctrine reaffirmed that stock subscriptions may be paid in such property as the corporation may be authorized to buy or use, and that such payment, made in good faith and at a fair valuation, is as valid and effectual as if made in cash. (*Post, pp. 6, 7.*)

Cases cited: Searight *v.* Payne, 6 Lea, 284; Albitztigui *v.* Guadalupe, etc., Mining Co., 92 Tenn., 605; 119 U. S., 343; 110 Ind., 417; 35 N. J. Eq., 501.

---

FROM KNOX.

---

Appeal from Chancery Court of Knox County. HENRY R. GIBSON, Ch.

TAYLOR & PEPPER for Complainants.

J. W. CALDWELL, GREEN & SHIELDS, LUCKEY & SANFORD, TEMPLETON & CATES, WELCKER & GAUT, and A. G. HOWE for Defendants.

CALDWELL, J. The Hercules Marble Company was chartered under the laws of West Virginia, and

had its principal business office at Knoxville, Tennessee. In February, 1891, T. W. Keller and others, creditors and shareholders, filed their bill against said corporation and others, alleging its insolvency, and seeking to have its affairs settled and wound up under the decrees of the Chancery Court at Knoxville. In due time a receiver was appointed and placed in possession of the assets of the company.

Thereafter, on August 8, 1891, J. J. and J. M. Kelley, composing the firm of Kelly Brothers, by permission expressly granted in that cause, filed the present bill, in behalf of themselves and other creditors, against numerous holders of stock of said company. This bill was filed in aid of that one, and its purpose was to compel the present stockholders to contribute *pro rata* an aggregate sum sufficient in amount to satisfy such balance of the liabilities of the corporation as might remain unpaid after the exhaustion of the assets in the hands of the receiver.

The material substance of the particular allegations upon which this relief was sought, briefly stated, is: That not more than ten per cent. of the stock subscription of the Hercules Marble Company was ever in fact paid, though the certificates of stock appear, upon their faces, to be fully paid up and non-assessable; and that the present holders knew, or should have known, that they were not fully paid up, from the fact that they respectively acquired their stock at merely nominal prices.

Two of the defendants almost conceded the right of the complainants to the relief sought, while the others (who are numerous) vigorously resisted the bill. Some of those resisting averred that the subscription to stock was in fact paid in full, as indicated on the face of the certificates; and these joined others in further averring that they purchased their respective certificates upon the open market, at the market price, and in the full belief that they were in fact what they purported to be.

It was developed in the proof, that the Hercules Marble Company was chartered on April 13, 1888, with a subscribed capital stock of $50,000 only; but with the express privilege of increasing the same to $100,000; that, in pursuance of that privilege, on May 22, 1888, the capital stock was fixed at $100,-000, the number of shares being 10,000, at the par value of. $10.00 each.

It was further developed, that 9,950 of said shares, of the par value of $99,950, were, by direction of the board of directors, regularly issued to T. L. Lambie, in consideration of his assignment to the corporation of certain leases of stone and marble lands; and that certificates for the whole $100,000 of stock were, by direction, issued, with the recitation upon their faces that they were full-paid and non-assessable.

It appeared also in the proof, that, after the issuance of the stock, Lambie transferred to the company different blocks of his stock, amounting, in the

Kelley Brothers *v.* Fletcher.

aggregate, to about $55,000, and that, thereafter, the corporation sold the same for its own benefit, part at the rate of twelve and one half cents and part at the rate of twenty-five cents on the dollar; and that much of the stock retained by Lambie, and much of that transferred by him to the corporation, and by it sold, is now owned by the defendants in this case.

Proof was also introduced tending to show that the leases assigned by Lambie to the corporation, in payment of his subscription to stock, were in fact of but little value. On motion of the defendants, all the latter proof was rejected, because not responsive to any issue presented in the pleadings.

The case was then heard upon the pleadings and the remaining proof, and the Chancellor, being of opinion that complainants were entitled to no relief, dismissed their bill. From that decree they have appealed to this Court, and assigned errors.

No exception was taken in the Court below to the action of the Court with respect to the rejected evidence, as must have been done to make such evidence a part of the record in this Court (1 Hum., 431; 1 Swan., 291; 8 Lea, 453; 85 Tenn., 438; 91 Tenn., 54), and no objection is here made to that action.

It is well settled that the capital stock of a corporation is a trust fund for the payment of corporate debts; and that stock subscribers are liable to creditors of the company for unpaid subscriptions so far as the same may be necessary for the payment of

corporate debts. This is believed to be the universal rule in America, though not so in England. Cook on Stocks and Stockholders, Sec. 199; *Wetherbee* v. *Baker*, 35 N. J. Eq., 501; *Sawyer* v. *Hoag*, 17 Wal., 611; 2 Morawetz on Private Corporations, Sec. 780; 1 Beach on Private Corporations, Sec. 113–116; Thompson's Liability of Stockholders, Sec. 10; *Ohio Life Ins. Co.* v. *Merchants' Ins. Co.*, 11 Hum., 31; *Sanger* v. *Upton*, 91 U. S., 60; Taylor on Private Corporations, Secs. 701 and 704; 2 Spelling on Private Corporations, Sec. 784.

It is quite as well settled that the subscriber may pay and satisfy his stock subscription either in money or in such property as the corporation may need, and agree to take, in good faith and at a fair valuation; and, if the property is taken at a fair valuation and in good faith, the payment is as effectual and as valid as though made in cash to the same amount. Cook on S. & S., Secs. 18–20, 423; 1 Morawetz, 425; *Searight* v. *Payne*, 6 Lea, 284, 285; *Albitztigui* v. *Guadalupe, etc., Mining Co.*, 8 Pick., 605; *Coit* v. *Gold Amalgamating Co.*, 119 U. S., 343; *Coffin* v. *Ransdell*, 110 Ind., 417 (S. C., 16 Am. & Eng. Corp. Cases, 432); Thompson on Liability of Shareholders, Sec. 134; Taylor on Private Corporations, Sec. 545; 2 Spelling on Private Corporations, Sec. 292; 35 N. J. Eq., 501.

In the case before us it is amply shown that the property assigned by Lambie and received by the Hercules Marble Company, in payment of his stock

subscription, was such as the corporation needed in the operation of its business, and, consequently, such as it had the legal right to purchase. About this there can be no dispute, upon this record, and beyond. this there is no proof before this Court with respect to the value of that property.

. The controlling question raised by the assignments of errors, and reply thereto, is one of pleading and practice. For complainants, it is contended that the burden was upon the defendants to show, by proof, independent of the fact of assignment by Lambie and acceptance by the corporation, that the property assigned by him to the corporation was reasonably worth the par value of his stock; while, on the other hand, the contention for the defendants is that it was incumbent upon the complainants first to allege, and then to prove, that the property so assigned was not reasonably worth so much.

The contention of the defendants, both as to the matter of pleading and as to the burden of proof, is well sustained upon principle and upon authority. It is a fundamental maxim in chancery pleading and practice, that the complainant must give the defendant notice of the case to be made against him, by alleging in the bill the facts intended to be proved, and that proof of facts not so alleged, will be rejected because not responsive to the issue. Story on Equity Pleading, Secs. 27, 28, 257; 1 Daniell's Chancery Pleading and Practice, 327, .852; Beach on Modern Eq. Prac., Secs. 89, 95, 99;

*Merriman* v. *Lacefield*, 4 Heis., 217; *Austin* v. *Ramsey*, 3 Tenn. Ch., 121.

It having been lawful for Lambie to sell, and for the corporation to buy such property as he assigned in payment of his stock, and they having exchanged one for the other, we can see no good reason why their contract in that behalf should not be binding upon all parties concerned or affected thereby, so long as it remains unimpeached. Nothing appearing to the contrary, the law presumes the contract to have been made in good faith, and the property of Lambie to have been sold and bought at a fair valuation; and when the defendants established the fact of the contract and its terms, without more, they thereby made a *prima facie* case of valid payment by Lambie.

The parties having been competent, under the law, to contract with each other with respect to the matter before them, they are presumed to have done what they had a legal right to do, rather than what they had no legal right to do.

As to the burden of proof, Mr. Daniell says: "In general, it may be taken for granted that wherever a *prima facie* right is proved, or admitted by the pleadings, the *onus probandi* is always upon the person calling such right in question. * * * Indeed, in all cases where the presumption of law is in favor of a party, it will be incumbent on the other party to disprove it, though in so doing he

may have to prove a negative.'' Daniell's Chancery
Pleading and Practice, pp. 850, 851.

Judge Dillon, in a case like this one, says: ''The
plaintiff—a single creditor—does not, for himself and
other creditors, file a bill to impeach as fraudulent
this transaction between the corporation and the
original stockholders; but he simply states that the
shares of stock issued to Hazard have not been paid
for, either by him or the defendant, the transferee
and present holder of the stock. Issue was taken
on this averment, and the proof showed that the
shares in question had been paid for precisely as
they were originally agreed to be paid for, viz.:
By a conveyance of the mining property to the
corporation. Unless this agreement is rescinded or
set aside for fraud, how can it be said that the
stock has not been paid for? The parties have
agreed that it has been paid for, and that agree-
ment is conclusive, unless it is rescinded or im-
peached for fraud, and this cannot be done unless
the attack is directly made.'' *Phelan* v. *Hazard*,
5 Dillon, 50.

In the case of *Coit* v. *Gold Amalgamating Co.*,
119 U. S., 345, Mr. Justice Miller said: ''If it
were proved that actual fraud was committed in the
payment of the stock, and that the complainant had
given credit to the company from a belief that its
stock was fully paid, there would undoubtedly be
substantial ground for the relief asked. But where
the charter authorizes capital stock to be paid in

property, and the shareholders honestly, and in good faith, put in property instead of money, in payment of their subscriptions, third parties have no ground of complaint. The case is very different from that in which subscriptions to stock are payable in cash, and where only a part of the installments has been paid. In that case, there is still a debt due to the corporation, which, if it become insolvent, may be sequestered in equity by the creditors, as a trust fund, liable to the payment of their debts. But where full-paid stock is issued for property received, there must be actual fraud in the transaction, to enable creditors of the corporation to call stockholders to account. A gross and obvious overvaluation of property would be strong evidence of fraud.''

The Supreme Court of Indiana has said: ''The principles deducible from the authorities already cited is that, even in case of an overvaluation of property transferred to the corporation in payment of shares, the transaction, unless void for some reason, is binding so long as it is not impeached by the corporation or its assignee; and it can be impeached only for fraud upon the corporation.'' *Coffin* v. *Ransdell*, 110 Ind., 417.

In each of the two cases last referred to, there was a charge that the property received by the corporation, in payment of stock, was taken at an overvaluation. In a later case, decided by the Supreme Court of Indiana, the opinion is concluded in

these words: "In disposing of this case, we think it proper to say that it is apparent that the issues were not broad enough to permit the introduction of the evidence by which the appellants sought to establish their case. The case made in the pleadings depended entirely upon the allegations of non-collection of the capital stock of the company. The order made by the board of directors, introduced by the plaintiffs, and the contract between the water company and Comegys & Lewis, given in evidence by defendants, show that the full amount of the capital stock had been paid, to the satisfaction of the contracting parties. In the well considered case of *Coffin* v. *Ransdell*, 110 Ind., 417, it was held by this Court that such payment could only be impeached for fraud. No suggestion of fraud is made in the pleadings, and, without making charge of fraud in the complaint, the plaintiffs could introduce no evidence to show, or tending to show, fraud as a basis of recovery." *Clow* v. *Brown*, 31 N. E. Reporter, 362.

In a case somewhat like the one before us, the Supreme Court of Maryland has said: "So long as the transaction stands unimpeached for fraud, Courts will treat as a payment that which the parties themselves have agreed shall be a payment; and this, too, in cases where the rights of creditors are involved." *Brant* v. *Ehlen*, 59 Md., p. 1.

Mr. Cook says: "It is now well settled that, in order to invalidate an issue of stock, which is issued for property taken at an overvaluation, it must be

shown, not only that there was an overvaluation, but also that such overvaluation was intentional, and, consequently, fraudulent." Cook on S. & S., Secs. 35 and 47.

Mr. Thompson, after considering the question of paying for shares in property, through several sections of his work on Liability of Stockholders, concludes as follows: "The whole discussion resolves itself into the following conclusions: A corporation may take, in payment of its shares, any property which it may lawfully purchase. Such a transaction is not *ultra vires* or void, but is valid and binding upon the original share takers and upon the corporation, unless it is rescinded; or set aside for fraud. While such a contract stands unimpeached, the Courts, even where the rights of creditors are involved, will treat that as payment which the parties have agreed shall be payment." Thompson's Liability of Stockholders, Sec. 134.

Mr. Taylor, after announcing as well recognized the rule that property may be taken in payment for stock, continues: "Such transactions may be opened to show fraud, and, if the property received is grossly unequal in value to the par value of the shares, the shareholder who received the shares originally, or his subsequent transferee with notice of the circumstances, may be compelled to make up the difference in value, in a suit brought by or on behalf of persons injured thereby." Taylor on Private Corp., Sec. 545.

Mr. Spelling says that such transactions "have been upheld against creditors only where the contract for the rendition of services or the purchase of property, payable in stock, has been made in good faith, and the property taken in payment has been put in at a fair, *bona fide* valuation. Such payment discharges a party from his liability to creditors upon his subscription, though it be excessive, provided that, in fixing and accepting it, the agents of the company have acted in good faith." 2 Spelling on Private Corp., Sec. 792.

*Gogebec Investment Co.* v. *Iron Chief Mining Co.* is a case in which a creditor of an insolvent corporation sued certain of its stockholders to recover unpaid stock, upon the allegation that they had transferred to the corporation certain mining property at ten times its real value, and obtained therefor full-paid stock. Hearing the case on demurrer, the Court said: "In an action against the stockholders of a corporation, to compel them to contribute to the payment of the debts of the insolvent corporation, it is only necessary, in order to make out a *prima facie* case, to establish the fact that the stockholder has not, in good faith, paid the par value of his stock to the corporation."

In the same case it is said: "The allegations of the complaint, which are admitted to be true by the demurrer, show conclusively that the stockholder defendants have not, as between themselves and the creditors, paid in full for their stock, and are, there-

fore, liable to make further payment, for the bene-
fit of the plaintiff, as a creditor of the corporation.
This is all that is necessary, under our statute or
at common law, to make a case against the stock-
holder, of unpaid stock, in favor of a creditor of
the insolvent corporation." 23 American State Re-
ports, pp. 419–21 (S. C., 78 Wis., 427).

Similar relief was sought in the case of *Elyton
Land Co.* v. *Birmingham Warehouse and Elevator
Co.*, wherein the Court concluded an exhaustive opin-
ion in the following words: "The statements of fact
in the bill support the conclusion therein averred,
that the transaction by which payment for the stock
was attempted to be made, was merely colorable;
in other words, that it was not really a payment,
but had only the outward appearance, without the
substance, of a payment. Such being the case, the
individual defendants are still liable on their stock
subscriptions, to the extent that the attempted pay-
ment falls short of, a *bona fide* compliance with the
terms of the contract. And the allegations as to
excessive overvaluation of property in question, were
sufficient, under the rules above stated." 25 Am.
State Reports, pp. 82–3 (S. C., 92 Ala., 407).

The late case of *Lloyd* v. *Preston*, is one in which
creditors of an insolvent corporation sought to com-
pel a stockholder to pay his subscription. In the
original bill, complainants alleged that no part of the
stock subscriptions had been paid. Defense was made
on the ground, as claimed in the answer, that full

payment had been made by the transfer of property. Thereupon, an amended bill was filed, alleging collusion between the directors of the corporation and defendant, Harper; and that the "property transferred by Harper to the company was not worth one fiftieth part" of the sum at which he sold it; and that he knew that fact at the time. The hurtful part of the amended bill was denied by Harper.

The Circuit Court, hearing the case upon these pleadings and proof, found "that the entire organization was grossly fraudulent from first to last, without a single honest incident or redeeming feature."

Mr. Justice Shiras, speaking for the Supreme Court, on appeal, said: "It having been found, on convincing evidence, that the overvaluation of the property transferred to the railway company by Harper, in pretended payment of the subscriptions to capital stock, was so gross and obvious, as, in connection with the other facts in the case, to clearly establish a case of fraud, and to entitle *bona fide* creditors to enforce actual payment by the subscribers, it only remains to consider the effect of the defenses set up." 146 U. S., p. 642.

The foregoing quotations from text writers and adjudicated cases, abundantly sustain the proposition that the transaction whereby Lambie obtained full paid stock as the price of property conveyed, must stand until impeached by appropriate allegation and proof; and that, until that is done, no liability can be fixed upon any holder of that stock for further

payment. No such liability can arise by presumption from the mere fact that property instead of money was used in paying for the stock.

This is conclusive of the whole case, for all of the defendants are holders of parts of the Lambie stock, all of which, upon this record, must be treated as full paid and non-assessable; whether purchased by the present holders from the corporation, one of his transferees, or from other transferees, or from him directly. In the hands of Lambie it would be so regarded. In the hands of others after him, whether donee or purchaser, it is at least upon as high a plane.

Let the decree be affirmed.

Judge Wilkes dissents.